[No. 2793. Decided March 11, 1898.]

ANDREW J. KROENERT, *Respondent*, v. B. F. JOHNSTON *et al.*, *Appellants*.

CORPORATIONS — PAYMENT OF SUBSCRIPTIONS IN PROPERTY — DIFFERENCE BETWEEN VALUE OF PROPERTY AND AMOUNT OF SUBSCRIPTION — STOCKHOLDER'S LIABILITY.

Where, on the organization of a corporation, real estate is turned in by one of the stockholders in payment of his shares at double the value of the real estate, and is so paid by him and accepted by the other stockholders without any intention of thereby defrauding existing or subsequent creditors, such stockholder is not liable for the difference between the face value of his shares and the actual value of the property given by him in payment therefor. (DUNBAR, J., dissents.)

Appeal from Superior Court, Chehalis County.—Hon. CHARLES W. HODGDON, Judge. Reversed.

*Austin E. Griffiths*, for appellants:

" Stockholders cannot be held liable for the difference between the par value of their stock and the actual value of the property turned in to the corporation in payment of the stock, unless fraud is proved." Cook, Stock and Stockholders, §§ 46, 47; *Fogg v. Blair*, 139 U. S. (35 Law. ed.) 118; *Coit v. Gold Amalgamating Co.*, 119 U. S. (30 Law. ed.) 343; *Coffin v. Ransdell*, 11 N. E. 20; *Bank of Fort Madison v. Alden*, 9 Sup. Ct. 332 (32 Law. ed. 372); *Du Pont v. Tilden*, 42 Fed. 87; *Hospes v. Car Co.*, 50

N. W. 1117 (31 Am. St. Rep. 637, 15 L. R. A. 470); *Young v. Iron Co.*, 31 N. W. 814; *Bickley v. Schlag*, 20 Atl. 250; *Medler v. Opera House Co.*, 28 Pac. 555.

*J. C. Cross*, for respondent.

The opinion of the court was delivered by

Scott, C. J.—The defendants were stockholders in the Aberdeen Shingle Company, a corporation organized for manufacturing purposes. The plaintiff is the owner of a judgment against the corporation obtained upon a number of assigned claims. Its property had been exhausted by levies of executions upon prior judgments, and he brought this action seeking to enforce a liability against the stockholders on the ground that the stock held by them had not been paid for, or had not been paid for up to the amount of its par value. The corporation was organized by Johnston, Marc Sherwood, Shoemaker, Hayes and M. R. Sherwood, with a capital stock of $10,000. The records relating to its organization and business were not kept in a systematic manner nor the proceedings fully shown in its minutes. The record of the trial proceedings is also confused and complicated, whereby we have been put to some difficulty in ascertaining the real contentions of the parties, and if the statement given should not be technically correct it is due to that; but from the briefs and the evidence we think we have presented the substantial matters in controversy.

It seems that the only real parties in interest in the corporation at the time of its organization were Johnston and Marc Sherwood, and that the entire shares of its capital stock were turned over to them in equal amounts and paid for in money and property. A short time after the organization Johnston transferred some of his shares of stock to Hayes, Shoemaker and M. R. Sherwood. We

take this first from respondent's brief, wherein he alludes to Johnston's deposition as showing it without indicating the part of the record where it may be seen. This deposition was not referred to in the index, and we have found it by turning over page by page a large part of the voluminous record. We call attention to this matter in order to prevent similar occurrences as far as possible in the future. We have in some instances imposed a punishment upon appellants for such neglect by striking statements, but as there was an attempt to index the record in this case, which appears to be correct in the main, we have passed it in this instance.

It seems the capital stock was paid for as follows: in money, $5,500; a boat, of the value of $500; and real estate of the alleged value of $4,000. While the cash payment was originally disputed, respondent (plaintiff) seems to have abandoned that contention, and the real controversy is narrowed down to a question of the value of the real estate at the time it was transferred to the corporation, the respondent contending that its real value was less than half the amount for which it was taken, and the court found accordingly. While the evidence was conflicting, we cannot say it preponderates in favor of the defendants, and the finding as to the fact must stand.

No service was had upon Marc Sherwood and Shoemaker, but the cause was prosecuted against the other defendants, and they have appealed from judgments against them severally.

The various decisions regarding corporate liability and the liability of stockholders are so conflicting and so controlled by different statutory regulations as to make an examination of them to determine their weight as authority upon the questions here presented an exceedingly difficult one. Recourse must first be had to our statutes. Section

4262, Bal. Code (Gen. Stat. § 1507), prescribes a liability upon the part of stockholders in a corporation like this for the amounts subscribed by them. This relates to their contractual liability, and if there has been no subscription there is no contract to pay the corporation or its creditors anything in cases where the shares of stock were originally issued as paid up. This action is practically brought as, or has resolved itself into, one to enforce a contractual liability. The fraud claimed bears more especially upon Johnston than upon the other defendants. The basis of it is that by subscribing for $5,000 of the stock he contracted to pay that amount to the corporation. The alleged fraud consisted in turning in the real estate for a greater sum than its actual value. The only charge of fraud that could obtain against the other defendants was in permitting this real estate to be accepted or in agreeing to accept it for the price stated. As we understand the facts there was no real subscribing by them for any part of the capital stock. In obtaining it from Johnston they assumed no part of his contractual liabilities to the corporation or to the creditors under our statutes. As against them the action can only be maintained on the ground of an actual intentional fraud upon subsequent creditors of the corporation, and there was no proof of any such; and we think the same result follows as to Johnston, under the proofs. There was no showing that the corporation was formed with the design to issue any paper or obligations to third parties or put any such afloat upon the market, or to incur any indebtedness at all. This was found necessary in the later prosecution of its business. We will first consider the case as to Johnston, for if there was no fraud, actual or in law on his part, there was clearly none as to the other appellants. We start with the proposition that in all private corporations formed for pecuniary profit, with the excep-

tion of corporations formed for mining purposes, an original subscription for the capital stock is required under the law, and that the parties subscribing become thereby obligated to pay the amounts subscribed, but in the absence of fraud the manner and kind of payment may be agreed upon among the incorporators, although there is no statute expressly providing, as does § 4280, Bal. Code (Gen. Stat., § 1588), that in the case of corporations formed for the working and developing of mining claims, etc., the capital stock may be represented entirely by the mining claims conveyed to the corporation, and that there need be no subscribing, nor any statute expressly authorizing a payment in property, it is yet conceded, and is undoubtedly the settled law here as to corporations like the one here in question, that property may nevertheless be turned in as a payment of the amount subscribed, but it is contended that the rule is different as to such corporations in that the property must then have a present actual value equal to the sum for which it is turned over in payment, and not a prospective or agreed one merely. There was no actual intended fraud here proved against any one of the incorporators or stockholders. If the judgment of the lower court can be sustained, it can only be upon the ground of a mere overvaluation of this real estate when it was turned in. As to Johnston it presents a double aspect, viz., that he contracted to pay a certain amount by his subscription and that he actually paid less than that amount in consequence of the real estate's being worth less than the sum for which it was accepted. As against the other appellants, they not having subscribed for any shares of stock, there was no contractual liability whatever (2 Thompson, Commentaries on Law of Corporations, § 1577), and it not being shown that any actual fraud was intended there was no foundation for any judgment against them

at all. There was some testimony by the plaintiff that before he commenced buying the company's paper he had a talk with one of the Sherwoods, who told him the stock was fully paid up, and that the real estate had been donated to the corporation, etc. But the corporation was not liable for any such representations, even. if intentionally false, conceding there might be a liability as against the corporation for misrepresentations of its officers and agents in dealing with a third party whereby the corporation should fraudulently obtain his property, for which the corporate property might be seized and its unpaid stock subscriptions collected. No such case is presented here. There might also be an individual liability established against the stockholder for a fraudulent misrepresentation respecting the corporation in some instances, but his liability there would not be controlled nor affected by his stock subscription. It would be entirely independent of it. But that is not this case. Without setting forth the testimony, the most favorable view proved for the plaintiff is that there was an overvaluation of the real estate turned in as a partial payment, but that this was offered, agreed upon and accepted without any intention to defraud any one, the corporation being formed for a legitimate and useful purpose. While the records of its proceedings were not fully kept, and no formal resolution accepting the real estate was shown as. of record, it was amply proven that such was the agreement, and the proof was admissible, although the records were deficient. The mere fact of overvaluation does not establish a fraud in law as against Johnston, or, in other words, render him liable to a subsequent creditor for the difference between the actual value and the agreed value upon his subscribed liability. This could only affect Johnston as stated, and not the other appellants, for he could dispose of his stock as he pleased, and the parties obtaining it would

not assume any liability to the corporation or to its creditors, in the absence of any actual or intended fraud upon their part. *Christensen v. Eno*, 106 N. Y. 97 (12 N. E. 648, 60 Am. Rep. 429); *Christensen v. Quintard*, 8 N. Y. Supp. 400. There could be no constructive fraud as to them under our statutes, much less a contractual liability.

In § 1616, 2 Thompson's Commentaries on Corp. Law, it is stated that a strict rule is recognized by some courts, to the effect that a payment of corporate stock in anything except money will not be regarded as payment except to the extent of the true value of the property received and regardless of the question of fraud, that in such cases the true inquiry is, what was the reasonable market value of the property conveyed or services rendered, and this doctrine meets with the author's approval. But in § 1618 a more generally accepted rule is given, to the effect that overvaluation must be fraudulent, and that in such cases actual fraud is meant in the sense of a dishonest purpose and not constructive or theoretical fraud, and in the absence of such the courts, even where the rights of creditors are involved, will treat that as a payment which the parties have agreed should be a payment. This seems to us to be the more reasonable and equitable rule, and sustained by the greater weight of authority. There is no hardship in requiring a party ordinarily who contemplates having dealings with a corporation or of purchasing its outstanding obligations to acquaint himself with the actual property it has. The fact that it was incorporated with a certain amount of capital stock, large or small, should make no difference in the absence of a fraudulent, dishonest purpose, as if organized for the object of issuing and floating its obligations with an apparently real but actually only a fictitious value. A knowledge of the amount of its designated capital stock would afford little or no criterion to de-

termine the amount of its assets, if it had been fully paid
in money. Its capital might be lost or impaired through
legitimate business transactions, and it would be just as
reasonable to hold that it would be a fraud on the creditors,
if it was not kept good and up to the stated amount. If it
were an open question here, we should incline to the latter
rule as expressed in § 1618, and so well sustained by emi-
nent authority. In fact our statutes, in prescribing no lia-
bility except the contractual one, would seem to require it
(§ 1577, *supra*). But it is not an open question. In
*Turner v. Bailey*, 12 Wash. 634 (42 Pac. 115), this court
approved the latter rule, and held that, where fully paid
stock is issued for property received, there must be actual
fraud in the transaction to enable creditors of the corpora-
tion to call the stockholders to account, citing a number
of cases, and there are many more, to sustain it, and citing
also with approval § 134 of Thompson on the Liability of
Stockholders, stating that even where the rights of credit-
ors are involved the courts will treat that as payment which
the parties have agreed should be payment, in the absence
of actual fraud. Attention has been called to the case of
the *Manhattan Trust Co. v. Seattle Coal & Iron Co.*, 16
Wash. 499 (48 Pac. 333, 737), but the facts proved in
that case were understood as bringing it within the rule ap-
plied to actual intended fraud in the prosecution of its
business, whatever the intention may have been when the
corporation was formed, and presented essentially differ-
ent questions from the ones here considered. Also in the
case of *Adamant Mfg. Co. v. Wallace*, 16 Wash. 614 (48
Pac. 415), while there was perhaps something said which,
considered alone, might seem in conflict with *Turner v.
Bailey, supra*, this discussion must be limited by what was
decided in the case, and there was no intention to overturn
the rule indorsed in *Turner v. Bailey, supra*, in either of

these later cases. The case of *Adamant Mfg. Co. v. Wallace* was disposed of on the ground that the creditors there knew that the stock subscriptions had been paid for in property of less value than the face value of the shares, and that consequently there was no fraud practiced upon them. If the strict rule mentioned in § 1616, *supra,* were followed, it would make no difference whether they knew it or not. Such knowledge would not be in the nature of an estoppel, for the creditors had nothing to do with the fixing of the price. In fact, it could better be said that in trusting the corporation they relied upon a right to enforce payment against the stock subscriber of the difference between the actual and the agreed value of the property transferred in payment. The decision sustains *Turner v. Bailey.* See, also, *Roy & Co. v. Scott, Hartley & Co.,* 11 Wash. 399 (39 Pac. 679).

It is of course a salutary, well established rule that a party is bound by what he knows, and it is just as well settled that he is charged with a knowledge of facts with which he may easily acquaint himself, and on these grounds this plaintiff would be defeated for the means of information were easily accessible. It does not appear that there was any misrepresentation to him of the amount of property that the corporation actually had at the time he commenced purchasing its obligations. In fact, it appears that he knew what property it did have. He testifies that he examined its records and that he had been told that the stock was fully paid. We think he would have been charged with that knowledge here, even though he had not investigated it. The law exacts reasonable caution on the part of the citizen in the conduct of business affairs, and is not overly zealous in protecting or enforcing the claims of those who are negligently careless or show a willingness to be misled.

The doctrine followed in this case, under the rule previously recognized, is only extending to a corporation the same protection that is extended to individuals, and is a just, equitable and necessary rule, especially in a state like this where we have witnessed a rapid and steady growth of private corporations, until a large part of its citizens have become directly interested therein. It has become the favorite, prevailing method for men of moderate means to engage in business enterprises, and the great bulk of business in all its ramifications in manufacturing enterprises, commerce, fisheries, irrigation of arid lands, mining and trading, even to small local concerns, is carried on through corporate agencies. The development of the state practically depends upon the success of such undertakings. All of its citizens are thereby greatly interested therein, and they are certainly entitled to reasonable protection. It is enough to hold them liable for actual fraudulent intent in their formation. This rule is sufficient to reach all those formed for dishonest purposes, and all can be held liable for dishonest, fraudulent practices, regardless of the original scheme of formation. But aside from this, it leaves men free to make their own contracts and place their own valuations upon their property. If a man desires to turn in property as a payment of shares of stock, and his associates are willing to take it at an agreed price, no one else being then interested, that agreed valuation should stand without danger of his being called upon to account years afterwards by some one who has dealt with the corporation, who might easily have ascertained its actual condition, in case he should think that such property was worth less than its value, as accepted by the corporation. A fraudulent representation of the amount of property it actually has is one thing, and a mere excessive estimation of its value is another and entirely different one. To sustain an agreed

valuation of property made in organizing a corporation does not contravene the trust fund theory. That relates more particularly to the disposition of its property after its organization and commencement of business, such as a distribution of it among the shareholders by dividends to the prejudice of its creditors. 2 Thompson, Commentaries on Corp. Law, § 1576.

The judgments rendered in this action must be reversed, and the cause remanded with instructions to dismiss it.

ANDERS and GORDON, JJ., concur.

REAVIS, J., concurs in the result.

DUNBAR, J. (*dissenting*).—I dissent, for the reason in the first place that the decision in this case is directly opposed to the decision rendered by this court in the case of *Adamant Mfg. Co. v. Wallace*, 16 Wash. 614 (48 Pac. 415). It is stated in the opinion in this case that there was perhaps something said which, considered alone, might seem in conflict with the opinion expressed by the majority, but that the case was disposed of on the ground that the creditors there knew that the stock subscriptions had been paid for in property of less value than the face value of the shares. There was not only something said in that case which was opposed to the rule laid down in this case, but it was specially decided, and the rule was announced clearly and emphatically, that the stock subscribed must be paid for in money or money's worth, and the opinion stated, after reviewing the facts and the law:

"This case, then, falls squarely within the rule which we have announced above, and, if there were no estoppels, the creditor would undoubtedly have the right to pursue this trust fund into the hands of the stockholders."

It is true that the creditors were held estopped from asserting that they had been misled by the action of the cor-

poration, but there would have been no necessity for the court to have invoked the doctrine of estoppel, if in any event the stockholders were not responsible to them for turning in their property at an overvaluation. If the majority of the court desires to recede from the law expressed in that case, it should be done by squarely overruling that decision so that the lower courts and the attorneys of the state will have some way of ascertaining what the law is on this question. As it is, a reading of the opinion referred to and of the majority opinion in this case will serve to confuse instead of to enlighten.

But, on principle, I am opposed to the doctrine announced in this case, regardless of any former decisions. There is no reason in law or morals why a corporation should not be compelled to act squarely and fairly with the world. Practically, it is impossible for the ordinary person dealing with a corporation to make such an examination as is referred to by the majority in this case, and he is helpless if he cannot rely upon the announcement of the corporation that its capital stock is of a certain actual value. The idea that he can protect himself by an examination of the books and property of the corporation is beautiful in theory, but desperate in practice. The doctrine that the liability of the shareholders to contribute the amount of their shares as capital is treated in equity as assets, is so well established that it would be almost revolutionary at this time to overturn it. Indeed, the majority opinion acknowledges the trust fund theory, but the great difficulty under this decision will be to *find* the fund that is acknowledged.

Assuming that the findings of the court are correct, the judgment should be affirmed.