[No. 10544. *En Banc.* November 28, 1913.]

EDWIN F. LANTZ, *as Receiver, etc., Appellant,* v.
CHRIST F. MOELLER *et al., Respondents.*[1]

CORPORATIONS—STOCK—INCREASE — SUBSCRIPTIONS — PAYMENT. If the assets of a corporation exceed its debts and the amount of the capital stock, the excess may be applied in payment of increased capital stock issued to its stockholders, the same being in the nature of a stock dividend.

SAME. In such a case, part of the increased capital stock may be issued to an outsider, where, by agreement, all the stockholders grouped their interest in the assets together with their undivided property and that of the outsider, as one fund to liquidate the subscriptions, if the total was equal to the par value of the stock as increased, less the original capital stock and debts.

SAME—STOCK—SUBSCRIPTION—PAYMENT—IN PROPERTY. The stock of a corporation is a trust fund for the benefit of creditors that must be paid for in money or money's worth, where the rights of creditors are affected; hence a receiver may recover of an insolvent corporation on stock subscriptions paid for in property of less value than the par value of the stock.

APPEAL—REVIEW—FINDINGS. Upon appeal, findings of a trial court on conflicting oral evidence are entitled to great weight, but

[1]Reported in 136 Pac. 687.

are not controlling; especially where the facts were not found, and the finding was but a conclusion.

CORPORATIONS—STOCK—SUBSCRIPTIONS—ACTIONS—EVIDENCE — SUFFICIENCY. In an action by a receiver of an insolvent corporation to recover unpaid stock subscriptions paid for in property of materially less value than the par value of the stock, the value of the assets of the corporation is material and necessary to fix the amount of the liability.

APPEAL—REVIEW—INVITED ERROR. Appellant cannot predicate error upon the exclusion of evidence invited by his objection thereto.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered March 7, 1912, upon findings in favor of the defendants, in an action to recover unpaid stock subscriptions. Affirmed.

*Raymond J. McMillan,* for appellant.
*Stallcup & Keyes,* for respondents.

MAIN, J.—This is an action brought by the appellant Edwin F. Lantz, as receiver for the West End Manufacturing Company, a corporation, for the purpose of recovering from the respondents Christ F. Moeller, William Scheer, Richard Rinne and Anton Anderson, the sum which is alleged to be due from each of them upon their subscription contract. On May 5, 1906, the West End Manufacturing Company, a corporation, was organized under the laws of the state of Washington with a capital stock of $8,200, which was divided into 82 shares of the par value of $100 per share. Of these 82 shares, Moeller owned 44; Anderson 24, and Rinne 14. On April 1, 1909, the capital stock of this corporation was increased from $8,200 to $41,400, which increase in the capital stock was represented by 332 shares, of the par value of $100 per share. Of these 332 shares representing the increase in the capital stock, Moeller subscribed for 74, Anderson for 54, Rinne for 84, and Scheer for 120. The contract of subscription was in terms as follows:

"We the undersigned being the owners of the entire stock of the West End Manufacturing Company, to wit: 82 shares of One Hundred Dollars each, and having this day duly increased the capital stock of said corporation from $8,200 divided into 82 shares of $100 each to $41,400 divided into 414 shares of $100 each. Now the increased number of shares, to wit: 332 are hereby subscribed and paid for and taken as follows, to wit: by transferring to and vesting in said corporation the following described property: Lots one (1) to six (6) Block 1130 Alliance Addition to the city of Tacoma; Block fifteen (15) Prescott's Second Addition to the city of Tacoma; that tract of land bounded on the east by the west line of Block fourteen (14) of Prescott's Second Addition, extended north, on the north by a line 200 feet northerly from the Northern Pacific Ry. Co. right of way, measured at right angles and parallel to said right of way, on the west by the west line of the Northeast quarter of the Southeast quarter of Section Seven (7), Township Twenty (20), North, Range Three (3), East W. M., and on the South by a line Fifty (50) feet northerly from the Northern Pacific Ry. Co. right of way measured at right angles and parallel to said right of way, and certain building contracts and bills receivable. All of which have been vested in the said corporation by the undersigned subscribers to the said increased stock in the following proportions, to wit:

|  | New stock. | Old stock. | Total stock. | Value. |
|---|---|---|---|---|
| C. F. Moeller: | 74 | 44 | 118 | $11,800 |
| Wm. Scheer: | 120 | 00 | 120 | 12,000 |
| Anton Anderson: | 54 | 24 | 78 | 7,800 |
| Richard Rinne: | 84 | 14 | 98 | 9,800 |
|  | 332 | 82 | 414 | $41,400 |

"C. F. Moeller,
"Anton Anderson,
"Richard Rinne,
"William Scheer."

An examination of this subscription contract discloses that the increased capital stock was paid for by transferring to the corporation, (1) lots 1 to 6 inclusive in block 1130, Alliance addition to the city of Tacoma; (2) block 15, Prescott's addition to the city of Tacoma; (3) an ir-

regular tract of ground in Prescott's Second addition; and
(4) certain building contracts and bills receivable. The
evidence shows, (1) that lots 1 to 6 in Alliance addition were
held under contract of purchase by Moeller, Rinne and An-
derson, and that their interest therein was of the reasonable
value of $4,500; (2) that block 14 in Prescott's addition
was owned by Scheer, and was worth approximately $6,000;
(3) that the irregular tract of ground was owned by the cor-
poration itself prior to the 1st day of April, 1909, the date
of the increase of the capital stock; and (4) that the build-
ing contracts and bills receivable were the property of the
corporation. It will be seen, therefore (1) that Moeller, for
his 74 shares of the increased capital stock of the par value
of $7,400 paid $1,500, that being the amount of his inter-
est in the Alliance addition property, and in addition to
this, whatever interest he had in the assets of the old cor-
poration after deducting the amount of its capital stock
and debts; (2) that Anderson, for his 54 shares of the
increased capital stock of the par value of $5,400, paid
$1,500 in property and his interest in the net assets of the
old corporation; (3) that Rinne, in payment of his 84
shares of the increased capital stock of the par value of $8,-
400, paid $1,500 in property and $2,000 in cash, and in
addition to this, his proportionate interest in the net assets
of the original corporation; and (4) that Scheer, for his
120 shares of the increased capital stock of the par value
of $12,000, paid in property of the reasonable value of
$6,000.

On July 17, 1911, the corporation being then indebted
in the sum of $33,837.03 and being in an insolvent condi-
tion, in an action then pending in the superior court, Edwin
F. Lantz was appointed receiver. The assets of the corpor-
ation being insufficient to meet its obligations, the receiver,
upon due notice to each of the respondents, applied to the
superior court for leave to make an assessment and call for
the amounts alleged to be due upon the subscription con-

tract. A hearing being had, the court found that an assessment and call was necessary. Thereupon due notice was given to each of the respondents, and demand for payment made, which was refused. Suit was brought against the respondents for the amount alleged to be due from each of them. The cause was tried to the court without a jury.

From the evidence introduced upon the trial, it appears that the method adopted for the payment of the increased capital stock was this: Moeller, Anderson and Rinne, being the owners and holders of the entire capital stock of the original corporation, and Scheer, not a stockholder in the old company, attempted to group into a common fund the individual property of each, together with the net assets of the original corporation, and the whole was to operate as a payment for the increased stock. At the conclusion of the trial, the court dismissed the action and made a finding that the stock subscribed for by each of the respondents had been fully paid, from which judgment the appeal was taken.

The first question that must be determined is whether or not the assets of the original corporation, after deducting the amount of its capital stock and debts, can be applied on the subscription contract to the increased capital stock. The appellant argues that the assets of the original corporation, over and above the amount of its capital stock and debts, if any, cannot be applied in payment of the increased capital stock, and that the only question in the case is, Was the value of the property turned over by the individual subscribers equal to the par value of the stock subscribed for? This position is not tenable. If the assets of the original corporation on April 1, 1909, exceeded its debts and the amount of the capital stock, the excess might be applied in payment of the increased capital stock which had been subscribed for by the stockholders of the original corporation. This would be in the nature of a stock dividend. 2 Clark and Marshall, Private Corporations, p. 1603; 1

Cook, Corporations (6th ed.), § 287. The latter citation states the rule thus:

"A frequent method of issuing an increase of the capital stock is by a stock dividend. . . . But in all cases of a stock dividend, as a method of issuing an increase of the capital stock, there must be in possession of the corporation an amount of property, over and above its corporate debts, equal to the whole capital stock, including the increase; and this amount cannot afterwards be used for any kind of a dividend."

It is true that Scheer owned no stock in the old corporation and would, therefore, have no interest in its assets; but, if all of the stockholders, by agreement, grouped their interest in the assets together with the individual property of themselves and an outsider, and intended that the total should be considered as one fund to liquidate the subscription, it would appear that, if the total was equivalent to the par value of the stock as increased, less the capital stock and debts of the original corporation, it would operate as payment of the subscription.

The respondents contend that, when the stock is paid for by the transfer of property, the liquidation of the liability on the subscription contract is complete, even though there may be a material discrepancy between the par value of the stock and the value of the property transferred in payment thereof, unless there is fraud in the transaction either actual or constructive. According to this contention, it would be immaterial whether or not the value of the property transferred to the corporation in payment of the subscription was substantially equivalent to the par value of the stock. It must be admitted that the expressions of this court, from time to time, have not been harmonious upon this question. The rule contended for by the respondents appears to be supported in the cases of *Turner v. Bailey*, 12 Wash. 634, 42 Pac. 115; *Kroenert v. Johnston*, 19 Wash. 96, 52 Pac. 605, and possibly some others. The opposite doctrine, that the stock of a corporation is a trust fund for the benefit of

its creditors and that, when the rights of creditors are involved, the stock subscribed for must be paid in money or money's worth, is upheld in the following cases: *Adamant Mfg. Co. v. Wallace,* 16 Wash. 614, 48 Pac. 415; *Dunlap v. Rauch,* 24 Wash. 620, 64 Pac. 807; *Davies v. Ball,* 64 Wash. 292, 116 Pac. 833. In the *Adamant* case, *supra,* this court in an opinion written by the late Chief Justice Dunbar, said:

"The doctrine that the stock of a corporation is a trust fund for the benefit of creditors is one which is founded in equity and fair dealing, and in any event has become so well established in this country that it can no longer be gainsaid. This doctrine was announced by Chancellor Kent, as early as 1824, in *Wood v. Dummer,* 3 Mason, 309, and since that time has become the established law of this country and is termed the 'American doctrine,' although, as shown in the case above referred to, the same doctrine had long been established in England; and so universally has this doctrine been accepted, in America especially, that the citation of authorities seems a work of supererogation. We will, however, quote from 2 Morawetz on Private Corporations, § 820, the rule which is announced as follows: 'Debts due a corporation are equitable assets, and may be reached by creditors through the aid of a court of chancery, if the legal assets which can be reached by execution prove insufficient. The liability of the shareholders to contribute the amount of their shares as capital is treated in equity as assets, like other legal claims belonging to the corporation. This liability, together with the capital actually contributed, constitutes the trust fund which in equity is deemed pledged for the payment of the corporate debts.' This being true, then it must necessarily follow, for the protection of creditors who dealt with these corporations, that the stock subscribed for must be paid in cash or in property of an equivalent value. In other words, the corporation must be in the actual condition which it represents itself to be in financially. If it were allowed to hold itself out as having a capital stock of $100,000, when in reality the capital stock, which is and must be under the theory of the law, assets in the hands of the corporation, is worth only one-half that amount, the corporation is to that extent doing busi-

ness under false colors, and is obtaining credit upon the faith of an asserted estate which is purely fictitious."

We think the rule as laid down in the *Adamant* case is not only legally but ethically sound, and all the decisions of this court which are not in harmony with the views therein expressed are overruled.

It is also contended by the respondents, that, since the trial court made a finding that the stock was fully paid for, this court should not review such finding; but we think the rule contended for is stated too broadly. If the trial court makes a finding of fact based upon disputed oral testimony, such finding of fact will be given weight; but it is not controlling, as has frequently been expressed. The court, however, in the present case did not find the facts which would show that the stock was fully paid for, but merely found as a conclusion that such was the result.

From the record in this case, it cannot be determined to what extent, if at all, the assets of the original corporation exceeded the amount of its capital stock and debts at the time of the increase. The appellant introduced no evidence tending to show this fact, but only showed the value of the property turned over by the individual subscribers, and that this was materially less than the par value of the stock subscribed for. During the trial, the respondents attempted to show the value of the assets of the original corporation at the time in question, but this evidence was objected to by the appellant and sustained by the court. The record, therefore, is silent upon a material fact. The appellant, however, is not in a position to predicate error upon the ruling of the trial court in excluding this evidence, he having invited the ruling by objecting to the testimony when it was offered by the respondents.

The judgment will therefore be affirmed.

ALL CONCUR.